**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 15-3147

BRETT J. WILLIAMSON,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:13-CR-20011-KHV)**

Melody Brannon, Kansas Federal Public Defender, Topeka, Kansas, for Appellant.

Carrie N. Capwell, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with her on the brief), Office of the United States Attorney, Kansas City, Kansas, for Appellee.

Before **TYMKOVICH**, Chief Judge, **BRISCOE** and **MURPHY**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

Brett Williamson was charged with and convicted of various child pornography offenses. Prior to trial, it came to light that his defense counsel and

the prosecutor trying the case had a history together: they were divorced and shared custody of their child. For that and numerous other reasons, Williamson asked for new counsel, his third, but the district court denied his request. He ultimately chose to proceed to trial without an attorney and was convicted and sentenced to life in prison. Williamson now argues that the district court should have inquired into his defense counsel's potential personal conflict of interest to determine if the relationship might have affected his right to a fair trial, and that failure to do so requires automatic reversal.

We disagree, and decline to extend the automatic reversal rule from *Holloway v. Arkansas*, 435 U.S. 475 (1978), beyond its traditional application in multiple representation cases. And since Williamson has failed to make a showing that his counsel was laboring under an actual conflict of interest, we reject his conflict of interest argument based on his defense counsel's personal relationship with the prosecutor. We also reject Williamson's alternative arguments for new counsel: that his filing of a criminal complaint against his counsel constituted an actual conflict of interest, and that Williamson demonstrated a complete breakdown of communications between his attorney and himself.

We also reject Williamson's claim that the district court erred in allowing him to conduct his trial and sentencing pro se, since he voluntarily, knowingly, and intelligently waived his Sixth Amendment right to the assistance of counsel.

-2-

Finally, we affirm the district court's denial of Williamson's motion to suppress evidence recovered during the search of his Indiana home.

We therefore affirm the district court's decision in its entirety.

## I. Background

Williamson was charged with multiple counts of attempting to entice and coerce a minor to both engage in sexually explicit conduct and to film the assault. On these charges, he faced a potential sentence of life imprisonment.

Williamson was appointed a federal public defender from Kansas City, Kansas, who asked to withdraw as counsel seven weeks before the scheduled trial date. The district court granted that motion, continued the trial date, and appointed Robin Fowler, a local private attorney, as defense counsel. In February 2014, three months before the rescheduled trial, Mr. Fowler also filed a motion to withdraw as Williamson's counsel, citing a "total breakdown of communication between counsel and Mr. Williamson." R., Vol. 1 at 109. In his motion, Mr. Fowler stated that the breakdown was "so severe that it [was] irreconcilable" and that it had led to a "complete lack of trust" between himself and Williamson. *Id.*

During the hearing on his motion to withdraw, Mr. Fowler informed the court that he had told Williamson, as he tells all of his clients, that he and the Assistant United States Attorney assigned to the case, Kim Martin, were divorced and have a child together. He stated, "[t]hat's not an ethical dispute or an ethical problem and things like that happen a lot in smaller towns but I still make it clear.

I don't know if that adds to [Williamson's distrust of my advice] or not." R., Vol. 2 at 10. The court denied Mr. Fowler's motion to withdraw, finding the request untimely because it was close to trial and the court had previously granted the federal public defender's request to withdraw close to trial. The court also found that counsel had not shown a total breakdown in communication, any disagreement appeared to be "strategic disagreement" over who should control the case, and Williamson was "substantially and unreasonably" contributing to any breakdown in communication. R., Vol. 2 at 54–56; 63–64.

Less than two weeks before trial, Williamson filed a pro se motion for new counsel. After holding an expedited hearing on the motion, the district court denied Williamson's request, finding that if there was a conflict between Williamson and Mr. Fowler, Williamson was substantially and unreasonably contributing to the breakdown in communication, and the disagreements between the two boiled down to a strategic disagreement about how the case should be defended.

The court rescheduled the trial date, but approximately two weeks before the rescheduled date, Williamson filed a 12-page letter with the district court complaining further about his relationship with defense counsel. In the letter, Williamson alleged that he no longer trusted his lawyer and—for the first time—raised Mr. Fowler's relationship with the prosecutor as a potential conflict of interest in his case. The letter stated, "I have explained to many people that

my appointed attorney is divorced from the attorney for the government and everyone has agreed, inmate and guard alike, that this is a conflict of interest . . . . Does the law allow me to be represented by such adversaries as friends or family of the [prosecutor]?[1] I think the court has erred by appointing Mr. Fowler to me." R., Vol. 1 at 239; *see also id.* at 229 ("My court appointed attorney is Robin Fowler, who is divorced from AUSA Kim Martin (the prosecutor assigned to my case), [and] is purposely sabotaging my defense in motions and at hearings . . . ."). The letter also stated that Williamson had filed criminal charges against Mr. Fowler and was likely to file civil claims as well, and it questioned whether Mr. Fowler could continue to represent Williamson while those charges were pending. Williamson also added complaints about the district court's impartiality, alleging that the district court judge was also involved in the conspiracy between Mr. Fowler and the prosecutor.

The district court construed the letter as a motion for new counsel and held a hearing at which Mr. Fowler supported Williamson's request for new counsel. Neither the district court nor Williamson—when given the opportunity to speak on the record—addressed the issue of Mr. Fowler's relationship with the prosecutor as a potential conflict of interest in the case. The district court again

---

[1] The text of the record stated "friends or family of the victim," but, in context, the record makes clear that Williamson meant to say "friends or family of the *prosecutor*." Accordingly, we have substituted the term here and in the analysis section for clarity. *See* R., Vol. 1 at 239.

denied Williamson's motion, concluding he had failed to show a complete breakdown of communication with counsel, and—to the extent there were disagreements with counsel—they were matters of strategic disagreement. The district court also concluded Williamson had substantially and unreasonably contributed to any communication problems with counsel by insisting that Mr. Fowler raise what appeared to be frivolous issues.

Two days before trial, Williamson filed a pro se Motion to Relieve Counsel and Continue Pro Se. The district court denied the motion, concluding Williamson's decision to proceed pro se was "a procedural ploy to obtain new counsel," for which Williamson "relie[d] on the flawed premise that his current counsel is ineffective." R., Vol. 1 at 267. On the morning of jury selection, Williamson renewed his request to proceed pro se, and a different district court judge presided over the proceedings. The court advised Williamson that if he wanted to proceed pro se, he would be responsible for all aspects of the trial. The court carefully reviewed the charges and statutory penalties with Williamson, and strongly cautioned him against proceeding pro se. But Williamson insisted on proceeding pro se anyway, and the court granted his motion.

Williamson then represented himself at his trial and sentencing. The jury found him guilty on all counts, and the district court sentenced him to life in prison.

## II. Analysis

Williamson alleges that the district court erred: (1) in denying his motion for new counsel; (2) by allowing him to waive his right to counsel and proceed pro se at trial and sentencing; and (3) in denying his motion to suppress evidence recovered from a search of his residence. We address each argument in turn and, finding jurisdiction under 28 U.S.C. § 1291, we affirm the district court's decision in full.

## A. Motion for New Counsel

Williamson challenges the district court's denial of his motion for new counsel based on irreconcilable conflicts. First, he claims the court should have examined whether defense counsel, Mr. Fowler, had a conflict of interest stemming from his ongoing co-parenting relationship with his former wife, the Assistant United States Attorney prosecuting Williamson's case. Alternatively, Williamson argues that his filing of a criminal complaint against Mr. Fowler created a conflict of interest between counsel's self-interest and his duties to represent his client. Lastly, he maintains that he established a complete breakdown of communication with Mr. Fowler, and the court abused its discretion in denying the motion on that basis.

### 1. Defense Counsel's Conflict of Interest

Williamson first argues that Mr. Fowler had an irreconcilable conflict of interest because of his former marriage to the prosecutor and their ongoing co-parenting relationship. He claims this conflict of interest, along with the strained

attorney-client relationship between Williamson and Mr. Fowler, created a high risk of the denial of his right to counsel.

The Sixth Amendment's guarantee of the right to counsel "includes the right to representation that is free from conflicts of interest." *Gardner v. Galetka*, 568 F.3d 862, 886 (10th Cir. 2009). A conflict of interest is "a division of loyalties that affected counsel's performance," *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002), and demonstrating a conflict of interest is one way for a defendant to show good cause to warrant substitution of counsel, *United States v. Porter*, 405 F.3d 1136, 1140 (10th Cir. 2005).

This case requires us to harmonize a series of Supreme Court cases addressing conflicts of interest in a variety of circumstances. A typical potential conflict can arise from joint or multiple representation situations when more than one codefendant is represented by the same attorney.[2] For example, one defendant might be advantaged in accepting a plea offer or testifying against his codefendant, but the second defendant could be disadvantaged if the first defendant chooses to do so. Multiple representation conflicts may arise at any

_____

[2] Although courts sometimes use these terms interchangeably, the Sixth Circuit explained the difference in *McFarland v. Yukins*: "joint and dual representation refer to simultaneous representation occurring in the same proceeding, while multiple representation refers to simultaneous representation in separate proceedings." 356 F.3d 688, 701 (6th Cir. 2004); *see also Jalowiec v. Bradshaw*, 657 F.3d 293, 315 (6th Cir. 2011) (defining successive representation as a situation "where defense counsel has previously represented a co-defendant or trial witness," while concurrent representation "occurs where a single attorney simultaneously represents two or more codefendants").

point in the criminal process, from the plea bargaining stage to sentencing, even if the codefendants' interests initially appear to converge. Wayne R. LaFave, et. al, 3 Crim. Proc. § 11.9(a) (4th ed. 2016 update).

Other types of conflicts can arise from an attorney's relationship with other clients, witnesses, victims, or—as here—the prosecution. And although all of the above situations give rise to a *potential* conflict of interest, that potential will only be converted to an *actual* conflict of interest if, over the course of litigation, the defendant's interests actually clash with his attorney's interests. *See id.* An actual conflict of interest therefore means a "conflict that *affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171 (emphasis added). In other words, an actual conflict exists when "counsel [is] forced to make choices advancing other interests to the detriment of his client." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998).

An actual conflict can support an ineffective assistance of counsel claim where the conflict prejudiced the defendant's representation. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). Generally, a defendant must demonstrate prejudice flowing from the conflict, but in some circumstances, a court will presume prejudice when the conflict amounts to the complete denial of counsel. *See id.* at 692; *United States v. Cronic*, 466 U.S. 648, 658–60 (1984).

So far, the Supreme Court has applied the "presumed prejudice" rule only for conflicts of interest in multiple representation cases. Beginning with

*Holloway v. Arkansas*, 435 U.S. 475 (1978), the Court established that whenever a trial court improperly requires counsel to represent multiple codefendants over counsel's timely objection, reviewing courts will apply an "automatic reversal" rule. *Id.* at 476–91. The Court explained that while "joint representation[] is not *per se* violative of constitutional guarantees of effective assistance," defendants are entitled to representation free of a conflict of interest. *Id.* at 482. In sum, a court has a "duty to inquire" into a potential joint representation conflict of interest when defense counsel informs the court of the alleged conflict prior to trial, and "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Id.* at 488; *see also* LaFave, *supra*, at § 11.9(b).

Two years later, however, the Supreme Court declined to apply the automatic reversal rule when the defendant did not raise the conflict of interest *prior to trial*. In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Court distinguished *Holloway*, noting that trial courts necessarily rely on the judgment of defense counsel to bring these matters to their attention, and that counsel "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Id.* at 347. Therefore, "[u]nless the trial court *knows or reasonably should know* that a particular conflict exists, the court need not initiate an inquiry." *Id.* (quoting *Holloway*, 435 U.S. at 485) (emphasis added). In other words, absent a credible indication of an

-10-

actual conflict of interest before trial, a trial court's duty to inquire is limited.

Prejudice will not be presumed, and the automatic reversal rule will not apply.

The most recent and important Supreme Court decision in this line of cases is *Mickens v. Taylor*, 535 U.S. 162 (2002). In that case, the Court considered a conflict of interest raised on habeas review. Mickens's lead defense counsel had been representing the juvenile victim on unrelated charges when he was allegedly murdered by Mickens. The juvenile court judge who dismissed the pending charges against the victim upon the victim's death then appointed the same defense counsel to represent Mickens on the murder charge. Counsel did not disclose his prior representation, and Mickens only discovered the alleged conflict when a clerk mistakenly produced the victim's file to Mickens's federal habeas counsel.

The Court clarified and reaffirmed its previous holdings that a violation of *Holloway*'s duty to inquire required automatic reversal. It also held that if the defendant did not raise a timely objection to the conflict (as in *Cuyler*), the defendant must prove that his attorney was laboring under an actual conflict of interest for the court to reverse his conviction. *Id.* at 170–74. The Court rejected the defendant's plea to extend the automatic reversal rule to cases in which the trial court was unaware of a potential conflict, stating that such a position "makes little policy sense" because a judge's awareness of a potential conflict neither makes it more likely that counsel's performance will be affected by the conflict

nor makes it more difficult for a reviewing court to determine if counsel's performance was negatively impacted by the conflict. *Id.* at 172–74. Nor does the "vague, unspecified possibility of conflict" trigger a duty to inquire absent special circumstances. In short, the Court concluded that "automatic reversal [was not] an appropriate means of enforcing [*Cuyler*'s] mandate of inquiry." *Id.* at 173.

Read together, these cases establish a bifurcated standard for addressing conflict of interest claims in the multiple representation context. First, if the defendant objects to the alleged conflict prior to trial, prejudice is presumed if the trial court failed to inquire into the nature and scope of the conflict and required the defendant to proceed with the same attorney. In such instances, reversal is automatic. *See Holloway*, 435 U.S. at 484; *Selsor v. Kaiser*, 81 F.3d 1492, 1500, 1504, 1506 (10th Cir. 1996) (applying *Holloway* and holding automatic reversal was warranted because the district court did not inquire into the timely objection to the multiple representation).

But if the defendant does not object to the alleged conflict at trial, he must demonstrate on appeal that an actual conflict adversely affected his representation. Only if the defendant's demonstration is sufficient is prejudice presumed. *See Cuyler*, 446 U.S. at 348–49; *see also Alvarez*, 137 F.3d at 1251. In this context, the defendant has the burden to show specific facts to support his allegation of an actual conflict adverse to his interests. *See Gardner*, 568 F.3d at

-12-

886 (describing the test).  If the defendant's demonstration is insufficient, then traditional *Strickland* review will apply: the defendant must establish his counsel performed deficiently and that performance affected the outcome of trial. *Strickland*, 466 U.S. at 687–88, 694.

The question remains whether *Holloway*'s duty to inquire (and automatic reversal if the trial court fails to inquire) extends outside the multiple representation context.  Williamson argues it should include the potential conflict he alleges here.

Williamson first raised the alleged conflict between Mr. Fowler and the prosecutor, Ms. Martin, approximately two weeks prior to trial in a 12-page letter to the court that recounted numerous reasons why Mr. Fowler should be removed from the case and a new lawyer (his third) be appointed for trial.  Among the many conflicts he claimed to have with Mr. Fowler, Williamson mentioned Mr. Fowler's marriage:

> I have explained to many people that my appointed
> attorney is divorced from the attorney for the
> government and everyone has agreed, inmate and guard
> alike, that this is a conflict of interest . . . . Does the law
> allow me to be represented by such adversaries as
> friends or family of the [prosecutor]?  I think the court
> has erred by appointing Mr. Fowler to me.

R., Vol. 1 at 239; *see also id.* at 229 ("My court appointed attorney is Robin Fowler, who is divorced from AUSA Martin (the prosecutor assigned to my case), [and] is purposely sabotaging my defense in motions and at hearings . . . ."). In his brief, Williamson elaborated further, stating that the former marriage of his defense counsel and the prosecutor

> gave reason for [Mr. Fowler] to be less than fully and zealously adversarial, lest it damage or diminish his relationship with the mother of his child. An erstwhile marriage may carry continuing obligations, familial or financial or social. There may be lingering loyalties or resentments. Co-parenting a child is an ongoing relationship in which amicability is a laudable and common objective. This personal interest, like joint representation, could reasonably have been perceived as influencing counsel's judgment or dividing counsel's loyalty.

Aplt. Br. at 18. Since Williamson raised the issue before trial, he contends the district court had a duty to inquire into and dispel any questions of divided loyalty.

Williamson's argument is foreclosed by *Mickens*. As we noted above, the Supreme Court emphasized that its cases did not "establish, or indeed even support" an "expansive application" of the automatic reversal rule. The Court explained that *Holloway* "stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." And the Court noted that the purpose of those cases—which are exceptions from the ordinary requirement that a defendant show prejudice—was "to apply needed

-14-

prophylaxis in situations where [ordinary judicial review under the ineffective assistance of counsel standards of *Strickland*] itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 175–76.  The Court illustrated this point by referring to several alleged conflicts that the circuit courts had resolved under *Cuyler* when, the Court hinted, *Strickland* was likely the more appropriate standard.  *Id.* at 174–75.  One of those conflicts was, notably, defense counsel's "romantic entanglement with the prosecutor," but the Court also listed several other alleged conflicts, including "counsel's personal or financial interests" in a book deal about the client's case; counsel's future "job with the prosecutor's office"; counsel's teaching of classes to IRS auditors on the potential signs of criminal activity during the course of his representation of defendant; and counsel's "fear of antagonizing the trial judge." *Id.*[3]  In other words, since the *Mickens* Court

---

[3]  Although the *Mickens* Court listed these conflicts as examples of circuit courts improperly applying *Cuyler* "unblinkingly," the Court created further confusion by resting the opinion on the assumption that the case was properly decided under *Cuyler* in the lower courts.  So as to whether *Cuyler* or the more difficult *Strickland* review should apply to issues beyond prototypical multiple representation—such as successive representation, the issue in *Mickens*—was "as far as the jurisprudence of this Court is concerned, an open question."  *Mickens*, 535 U.S. at 174–76.  Thus, post-*Mickens*, the circuit courts are divided on how to interpret the case.  *See Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002) (quoting *Mickens*, 535 U.S. at 176); *see also Quince v. Crosby*, 360 F.3d 1259, 1263 n.4 (11th Cir. 2004) (same).  Some circuit courts have treated the *Mickens* Court's statements as dicta and have chosen to expand *Cuyler* outside the multiple representation context, while others have heeded the Court's caution and have either applied *Strickland* or declined to weigh in on the issue.  *Compare Earp v.*

(continued...)

-15-

questioned whether *Cuyler* was even the appropriate means of reviewing these alleged conflicts—as opposed to the more difficult *Strickland* standard—*Holloway*'s automatic reversal rule was certainly inapplicable to these non-multiple representation conflicts.

After *Mickens*, a trial court thus has a duty to inquire only if it knows or reasonably should know of an actual conflict.  In the multiple representation setting, the duty is mandatory, prejudice is presumed, and reversal is automatic. But if there is only the mere *possibility* of conflict, the duty to inquire exists only if the trial court has a substantial basis to believe an actual conflict exists.

---

[3](...continued)
*Ornoski*, 431 F.3d 1158, 1184–85 (9th Cir. 2005) (describing Ninth Circuit precedent as having "expanded the scope of the [*Cuyler*] exception to apply in other contexts"), *and United States v. Blount*, 291 F.3d 201, 211–12 (2d Cir. 2002) (applying *Cuyler* test on direct appeal where government witness was represented in an unrelated proceeding by a different member of defense counsel's law firm), *with United States v. Wright*, 745 F.3d 1231, 1233 (D.C. Cir. 2014) (stating that, "[s]ince *Mickens*, this Court has [like the Supreme Court] not decided whether the *Cuyler v. Sullivan* standard applies to cases involving successive representation), *and Morelos v. United States*, 709 F.3d 1246, 1252 (8th Cir. 2013) (describing the court's jurisprudence as having "expressly refrained from deciding whether the lowered burden in establishing prejudice applies to actual conflicts of interest which did not arise out of multiple representation"), *and United States v. Goodley*, 183 F. App'x. 419, 422 (5th Cir. 2006) (unpublished) (referencing the "strict limitation of [*Cuyler*] to cases involving multiple representation and noting that "the *Strickland* standard applies when [] the quality of representation is alleged to have been affected by the attorney's self-interest"), *and Whiting v. Burt*, 395 F.3d 602, 619 (6th Cir. 2005) (declining to expand *Cuyler* "beyond its present borders of multiple concurrent representation").

A number of cases from other circuits that were decided after *Mickens* support this interpretation. *See, e.g.*, *Blake v. United States*, 723 F.3d 870, 882 n.11 (7th Cir. 2013) (refusing to apply the automatic reversal rule because the defense counsel's conflict did not arise from joint representation and the court has "recognized that '[s]ubsequent Supreme Court decisions have limited the *Holloway* holding to situations in which the district court requires joint representation over a timely objection.'" (quoting *United States v. Lafuente*, 426 F.3d 894, 897 (7th Cir. 2005))); *Ausler v. United States*, 545 F.3d 1101, 1103–04 (8th Cir. 2008) (refusing to apply *Holloway* outside the multiple representation context).

As the First Circuit recognized in *United States v. Mota-Santana*, 391 F.3d 42 (1st Cir. 2004), if we held otherwise and treated attorney-client disagreements the same as conflicts arising from multiple representation situations "with resulting possible *per se* reversal without the necessity of proving prejudice," then "the nature of appeals in criminal cases would be dramatically altered. The odds are that many an unsuccessful defendant would be found nursing some disagreement with counsel." 391 F.3d at 46. In the same vein, a leading commentator notes, "while courts uniformly require an inquiry where counsel moves for withdrawal and cites a conflict other than multiple representation, *Holloway* arguably does not extend to such settings, so the failure to conduct an

-17-

inquiry does not require automatic reversal *as a matter of constitutional law*."
*See* LaFave, *supra*, at § 11.9(b) (emphasis added).

In support of his contention that *Holloway* governs here, Williamson relies on our decision in *United States v. Cook*, 45 F.3d 388 (10th Cir. 1995), *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001). In *Cook*, a § 2255 habeas decision, we held the defendant was denied effective assistance of counsel because we concluded that "a defendant's right to counsel free from conflicts of interest 'is not limited to cases involving joint representation of co-defendants . . . but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person.'" *Id.* at 393 (quoting *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988)). But *Cook* was not a personal conflict of interest case. Rather, the case involved a joint representation conflict: during trial, the court asked defense counsel to apprise the codefendant-turned government witness (whom he was not representing) of the consequences of her refusal to testify against his client. Although the defense counsel did not ultimately represent the codefendant in the subsequent proceedings, the conflict raised was the same as if he had. *See id.* at 391–92, 394. Our decision in *Cook*, therefore, does not control the outcome of this case.[4]

_____

[4] The existence of an actual, prejudicial conflict in *Cook* was also so "obvious" that the court found *Strickland* prejudice arising from counsel's failure

(continued...)

-18-

Williamson's reliance on *Cook*, moreover, is undermined by the Supreme

Court's decision in *Mickens* seven years later. As we explained, in that case, the

Court held that *Holloway*'s automatic reversal rule applied "only where defense

counsel *is forced to represent codefendants over his timely objection*, unless the

trial court has determined that there is no conflict." 535 U.S. at 168 (emphasis

added). In other words, in explaining its holding in *Holloway*, the Court

expressly limited the automatic reversal rule to multiple representation situations.

The language of *Holloway* itself also supports this reading. *See* 435 U.S. at 488

("[W]henever a trial court improperly requires *joint representation* over timely

objection reversal is automatic." (emphasis added)). The principle of *Holloway*

flows from the "disabling conflict" of joint representation, not from a universal

understanding that every potential conflict is created equally. *See* LaFave, *supra*,

at § 11.9(b).

Accordingly, we conclude that *Mickens* clarified that the automatic reversal

rule applies only to multiple representation conflicts of interest. Therefore, the

automatic reversal rule is inapplicable to the conflict alleged here. After *Mickens*,

a potential conflict of interest that is *not* a multiple representation

conflict—regardless of whether it is raised prior to trial—does not fall under

*Holloway*'s "duty to inquire" into potential conflicts of interest. Only if a court

[4](...continued)
to assert a "dead-bang winner" on direct appeal. *Cook*, 45 F.3d at 395.

knows or has reason to know of an *actual conflict* must it do more. And even if the court fails to inquire into an actual conflict, the automatic reversal rule will not apply. Instead, on appellate review, the court will consider the facts and circumstances of the case under the commands of *Strickland* before deciding if there was constitutional error.

Here, whether we should review Williamson's conflict of interest claim under *Cuyler* or the more difficult *Strickland* standard is immaterial, because Williamson cannot meet even *Cuyler*'s lesser standard. Williamson has failed to allege any instances suggesting that Mr. Fowler's representation was compromised due to his relationship with the prosecutor. In fact, before Williamson brought his conflict of interest concern to the attention of the court, Mr. Fowler *himself* made the court aware of his relationship with Ms. Martin, and specifically stated that it was not a conflict. During the February 2014 hearing on Mr. Fowler's motion to withdraw, he informed the court,

> I told [Williamson], obviously he's aware, I make it very
> clear with all my clients, that Miss Martin and I were
> married at one time, we have a child together. That's
> not an ethical dispute or an ethical problem and things
> like that happen a lot in smaller towns but I still make it
> clear. I don't know if that adds to [Williamson's
> distrust of my advice] or not.

R., Vol. 2 at 10. Williamson, moreover, failed to raise the alleged conflict of interest issue until months later, in his second pro se motion for new counsel.

-20-

Even then, when given the opportunity to state his concerns on the record, Williamson cited a litany of complaints against Mr. Fowler, but never mentioned Mr. Fowler's alleged personal conflict of interest. We cannot fault the district court for failing to inquire further when neither the defendant nor his counsel (who wanted out of the case) thought it was important enough to raise in front of the court. In short, the district court had no reason to believe, without more, that Mr. Fowler had an actual conflict that compromised his representation of Williamson.

In sum, since Williamson has failed to meet his burden under *Cuyler*, we reject his conflict of interest claim based on Mr. Fowler's relationship with the prosecutor.

### *2. Conflict Based on Criminal Complaint*

Alternatively, Williamson argues that the district court should have granted his motion for new counsel because he had filed a criminal complaint against Mr. Fowler, creating a conflict of interest between Mr. Fowler's self-interest and his duties to represent his client. We review a district court's denial of a motion to substitute counsel for abuse of discretion, *see United States v. Vargas*, 316 F.3d 1163, 1165 (10th Cir. 2003), and again disagree with Williamson and hold that filing, or threatening to file, a criminal or ethical complaint against an attorney does not *per se* create a conflict of interest requiring substitution of counsel.

A defendant's grievance against his attorney may establish good cause for substitution of counsel, but the mere act of filing a grievance is not dispositive. Instead, a defendant must show that his attorney possessed an actual conflict of interest with his client and that his performance was adversely affected due to that conflict. *See United States v. Holman*, 314 F.3d 837, 845–46 (7th Cir. 2002).

Although there are few authorities in our circuit that address this issue,[5] we are aided in our analysis by ample authority from other circuits on the topic of ethical complaints. In *United States v. Contractor*, 926 F.2d 128 (2d Cir. 1991), for instance, the Second Circuit held that a defendant's conflict of interest claim based on a bar association complaint that he had filed against his attorney prior to sentencing lacked merit because the defendant offered no evidence how the alleged conflict adversely affected his attorney's performance. *Id.* at 134. Similarly, in *United States v. Burns*, 990 F.2d 1426 (4th Cir. 1993), the Fourth Circuit explained that the Supreme Court has never suggested that a conflict between a defendant and his attorney arising from a separate proceeding requires

---

[5] In *Galloway v. Howard*, 624 F. Supp. 2d 1305 (W.D. Okla. 2008), the district court noted that we have, in unpublished opinions, "upheld a district court determination that counsel did not have an irreconcilable conflict notwithstanding the defendant's filing of a complaint with the bar association," and "rejected a habeas claim on grounds that the petitioner's filing of a complaint against his trial counsel with the state bar association did not reflect a reasonable probability of reversal if the issue had been raised on appeal." *Id.* at 1317–18 (discussing *United States v. Rhodes*, 157 F. App'x 84, 88 (10th Cir. 2005) (unpublished) and *Wiley v. Sirmons*, 196 F. App'x 727, 731 (10th Cir. 2006) (unpublished)). We, of course, refer to these unpublished decisions only for their persuasive value. Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

automatic reversal. In fact, as the court noted, the defendant's attorney would not have been advantaged in disciplinary proceedings before the state bar if he had failed to represent the defendant to the best of his ability in the criminal case. *Id.* at 1438; *see also Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006) ("Nothing in our precedent suggests that the mere filing of a malpractice action is sufficient to create a conflict of interest."). Further, the Fourth Circuit in *Burns* cautioned that to extend the automatic reversal rule to this situation might allow defendants to game the system: "to hold otherwise on such unpersuasive facts would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial. Such is not an invitation we wish to extend." *Burns*, 990 F.2d at 1438; *see Smith v. Lockhart*, 923 F.2d 1314, 1321 n.11 (8th Cir. 1991) (recognizing "the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys").

Thus, a defendant's mere filing of a disciplinary inquiry or criminal complaint against his attorney is not enough to establish an actual conflict of interest. An actual conflict exists only if an attorney is torn between two different interests, and a defendant must prove that he was prejudiced by actions resulting from the alleged conflict. *See Holman*, 314 F.3d at 845.

Here, Williamson argues that the court "should have accepted counsel's representations that the conflict [caused by Williamson's complaints against Mr.

-23-

Fowler] impaired his professional judgment, his ethical responsibilities, and his own self-interest." Reply Br. at 5. But a close examination of the record suggests that what Mr. Fowler was really concerned about was how the record would look on appeal; his statements on the whole do not suggest that he was torn between two competing interests.

Mr. Fowler recognized that Williamson's filing of a complaint against him with the Attorney General created a conflict of interest, but added, "I don't think that alone is enough to demand removal." R., Vol. 2 at 157, 160. Mr. Fowler also expressed a lack of concern with the charges, stating, "frankly, I doubt those will go anywhere." *Id.* at 157. Mr. Fowler's statement is consistent with the district court's findings: "Mr. Fowler has not asserted that the filing of the complaint would affect his professional performance in any manner whatsoever, and the Court is confident that he can and will continue to represent defendant in an utmost professional manner." R., Vol. 1 at 244. Instead, Mr. Fowler was concerned about how the disagreements between him and Williamson would appear in future appeals. *See* R., Vol. 2 at 159 ("[W]e'll be here in two and a half years in a 2255 and I will be answering questions, probably under oath, did you feel like you could communicate with your client? And I don't know at that stage what my answer will be . . . but I suspect my answer is going to be, no, there was no communication."); *Id.* at 158 ("[H]ow's that going to look in two years and in [a] 2255? Did I—was my advice to protect me or to protect him?").

Mr. Fowler made one statement to the court that requires further comment. During the hearing on May 30, 2014, Mr. Fowler told the court:

> I have pondered a competency evaluation . . . I'm not saying that []—I would file that today or this week or that it might come up between now and trial or after trial, before sentencing. And how [] do I as an attorney properly evaluate that and how is the record going to look . . . if that motion is filed after a complaint has been made against me?

R., Vol. 2 at 162. Although this concern is similar to the ones raised above—Mr. Fowler's concerns were forward-looking, based on how his representation would be viewed on appeal—and the record does not indicate that Mr. Fowler himself believed there was a conflict of interest at the time of his statements, this statement still gives us pause. Considering that Williamson eventually conducted his trial pro se, Mr. Fowler's failure to request a competency evaluation could have had a substantial effect on the outcome of the case. If Williamson's competency had been evaluated, and if he was found to be incompetent, he certainly would not have been able to represent himself in the subsequent proceedings.

Still, even assuming *arguendo* that the competency statement constituted an actual conflict, that is not the end of the inquiry. Williamson must also prove that Mr. Fowler's "performance was adversely affected because of [the] conflict [of interest]." *Holeman*, 314 F.3d at 845. Williamson cannot meet that standard. Mr. Fowler and Williamson's disagreements began long before Williamson filed

-25-

the complaint and Mr. Fowler made the statement about the competency evaluation. In fact, Mr. Fowler himself had filed a motion to withdraw back in February 2014, three months before the competency statement, citing a "total breakdown of communication between counsel and Mr. Williamson." R., Vol. 1 at 109.

Accordingly, it is impossible to draw a causal link between Williamson's filing of criminal charges against Mr. Fowler and Mr. Fowler's statement about Williamson's competency to demonstrate that Mr. Fowler's performance was adversely affected because of the charges filed against him. The parties simply have too complicated of a history.

We therefore reject Williamson's conflict of interest argument based on his filing of a criminal complaint against counsel.

### 3. *Complete Breakdown of Communication*

Williamson's third conflict-based argument is that the district court should have granted his motion for new counsel because he demonstrated a complete breakdown of communication between himself and Mr. Fowler.

A defendant may demonstrate abuse of discretion by showing "a complete breakdown of communication" between himself and counsel. *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987) (citation omitted). "Good cause for substitution of counsel consists of more than a mere strategic disagreement between a defendant and his attorney . . . rather there must be a total breakdown

in communications." *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002).

"[T]o prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *Id.* In reviewing a district court's denial of a motion to substitute counsel, we consider whether: (1) the defendant's request was timely; (2) the trial court adequately inquired into the reasons for making the request; (3) the defendant-attorney conflict was so great that it led to a total lack of communications precluding an adequate defense; and (4) the defendant substantially and unreasonably contributed to the breakdown in communications. *Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000); *see also United States v. Porter*, 405 F.3d 1136, 1140 (10th Cir. 2005).

The district court concluded that the motion was untimely and denied the request. But even if Williamson's request had been timely, the remaining *Romero* factors weigh against him. *See United States v. Lott*, 433 F.3d 719, 725 (10th Cir. 2006) (affirming the district court's denial of a motion to substitute counsel despite the fact that the motion was timely filed, because "the district court did not abuse its discretion in concluding the other three *Romero* factors weighed against finding a complete breakdown in communication"). Williamson concedes that the district court made an "adequate inquiry" into his reasons to ask for substitute counsel, Aplt. Br. at 32, so the remaining issues are only whether the

-27-

defendant-attorney conflict was so great that it led to a total lack of communications precluding an adequate defense and whether the defendant substantially and unreasonably contributed to the breakdown in communications. *See Romero*, 215 F.3d at 1113.

Williamson admits that "some disputes were related to trial tactics and strategic decisions" and that "courts have discretion to reject those disagreements as grounds for substitute counsel," Aplt. Br. at 32, but he argues that Mr. Fowler informed the court there was an "irreconcilable" and "total breakdown of communication" between himself and Williamson, there was a "complete lack of trust," and he did not feel that it was "appropriate . . . to continue as his attorney," Aplt. Br. at 33 (citations omitted); consequently, Williamson argues, the district court should have paid substantial deference to Mr. Fowler's view and allowed him to withdraw as Williamson's counsel.

But Williamson failed to provide the district court with legitimate reasons for his distrust of Mr. Fowler. Instead, most of the disagreements between the two resulted from their different views on case strategy and tactics, which the trial court recognized after considering Williamson's concerns at length.[6]

_____

[6] *See* R., Vol. 2 at 36–46, 61 (addressing issues raised by Williamson's February 11, 2014 letter to the court); R., Vol. 2 at 97 (after a lengthy inquiry into Williamson's complaints about Mr. Fowler during the April 29, 2014 hearing, the court stated, "Mr. Williamson, you are wasting the time of everybody in this courtroom."); R., Vol. 2 at 99 ("It also seems to me that what we're talking about is a strategic disagreement between you and your attorney about how this case

(continued...)

-28-

Williamson's remaining concerns about Mr. Fowler's representation were that Mr. Fowler had violated attorney-client confidentiality,[7] that he was threatening Williamson if he did not take the plea bargain offered by the government, and that Mr. Fowler had threatened to post the details of the crime in the newspaper to force Williamson to take the guilty plea out of fear for his life. These concerns are unreasonable. Williamson incorrectly believes that plea bargaining is unconstitutional and is a form of blackmail. The district court inquired into Williamson's other concerns, but determined that merely conveying the government's plea offers to the defendant is not "threat[ening]" conduct, and is actually required of defense counsel under *Missouri v. Frye*, 132 S. Ct. 1399 (2012). Additionally, the court determined that informing Williamson that the details of his case could be publicized if they went to trial was "not a threat" by

---

[6](...continued)
should be defended, [and] I have not heard anything which suggests to me from any objective point of view that Mr. Fowler is refusing or failing to provide the representation to which you are entitled under the Sixth Amendment to the United States Constitution."); R. Vol. 1 at 245 (finding that "defendant has not shown a complete breakdown of communications with Mr. Fowler or any other ground to warrant substitution of counsel" and "defendant has identified numerous matters of strategic disagreement with Mr. Fowler but these issues are ultimately matters of defense strategy left to the discretion of counsel.").

[7] Williamson made only a passing reference to a violation of attorney-client privilege that was distinct from the claims that counsel would blackmail him unless he took the plea bargain and that counsel threatened to post details of the crime in the newspaper. *See* R., Vol. 1 at 261 ("Counsel's slip-of-the-tongue that ''they' don't believe *your* story' gives the appearance that counsel has violated attorney/client privilege.").

Mr. Fowler, but a "fact of life." *See* R., Vol. 2 at 58; *see id.* at 61 ("What Mr. Fowler is trying to tell you, I believe, is that you need to understand the consequences of pleading guilty or going to trial. And what he's saying to you is accurate.").

Finally, the fourth *Romero* factor—whether the defendant substantially and unreasonably contributed to the breakdown in communications—weighs heavily against Williamson in this case. *See Romero*, 215 F.3d at 1113. The record is replete with evidence that Williamson was uncooperative and, at times, intransigent, when it came to his incorrect legal theories, even if Mr. Fowler could not state that their breakdown in communications was "100% Mr. Williamson's fault." R., Vol. 2 at 164. As the district court's comments make clear, Williamson wanted to control all of the strategic decisions in his case and complained about Mr. Fowler when he refused to "put[] up [with Williamson's] bogus theories and demand[s] that Mr. Fowler do things he can't ethically do." R., Vol. 2 at 56. Additionally, the district court noted that although Mr. Fowler claimed that there was a complete breakdown in communication when he requested to be removed as Williamson's counsel, "[d]efendant appears to have no problem communicating with counsel when he agrees with counsel's message on matters such as waiving a jury trial. Meaningful communication is clearly possible when defendant chooses to engage in it." R., Vol. 1 at 245 n.2.

-30-

In sum, the record makes clear that Williamson substantially and unreasonably contributed to the breakdown in communication with his counsel and supports the district court's denial of Williamson's requests for new counsel.

## B. Waiver of the Right to Counsel

Williamson next argues that the district court erred in allowing him to represent himself during his trial and sentencing.

A defendant has the Sixth Amendment right to waive his right to counsel and represent himself in a criminal case. *Faretta v. California*, 422 U.S. 806, 821, 832 (1975). But the waiver must be "an intentional relinquishment or abandonment of a known right or privilege." *United States v. McConnell*, 749 F.2d 1441, 1450–51 (10th Cir. 1984) (citation omitted). And "[b]efore a court may grant a waiver, it must ensure the defendant is 'aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" *Maynard v. Boone*, 468 F.3d 665, 676 (10th Cir. 2006) (quoting *Faretta*, 422 U.S. at 835).

We conduct a two-part test to determine whether a defendant has effectively waived his right to counsel. "First, we must determine whether the defendant voluntarily waived his right to counsel [and] [s]econd, we must determine whether the defendant's waiver of his right to counsel was made knowingly and intelligently." *United States v. Taylor*, 113 F.3d 1136, 1140 (10th Cir. 1997).

-31-

Under the first part of our analysis, whether a defendant's waiver of counsel is voluntary "turns on whether defendant's objections to present counsel are such that he has a right to new counsel." *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987). "A defendant's waiver is involuntary if he is forced to choose between *incompetent* counsel or appearing *pro se*." *United States v. Taylor*, 183 F.3d 1199, 1203 (10th Cir. 1999). And unless a defendant demonstrates good cause warranting the appointment of new counsel, the defendant's decision to waive counsel will be considered voluntary. *Taylor*, 113 F.3d at 1140.

Under the second part of our analysis, we look at the totality of the circumstances to determine whether a defendant has knowingly decided to proceed pro se. The test for an intelligent waiver "turns not only on the state of the record, but on all the circumstances of the case, including the defendant's age and education, his previous experience with criminal trials, and representation by counsel before trial." *Padilla*, 819 F.2d at 958. The "tried-and-true" method for determining that a waiver was knowing and intelligent is to conduct a *Faretta* hearing: "a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." *United States v. Vann*, 776 F.3d 746, 763 (10th Cir. 2015) (quoting *United States v. Willie*, 941 F.2d 1384, 1388 (10th Cir.

1991)).  "However, there is '[n]o precise litany' of questions that must be asked of defendants who choose self-representation."  *United States v. Turner*, 287 F.3d 980, 983 (10th Cir. 2002) (quoting *Padilla*, 819 F.2d at 959).  We review the validity of a waiver of the right to counsel de novo and the underlying factual findings for clear error.  *See id.*

Williamson contends that his decision to waive counsel and proceed pro se was a "Hobson's choice," because the district court refused his motion to substitute counsel.  Aplt. Br. at 39.  Under the first part of the inquiry, Williamson claims that his choice to proceed pro se was involuntary, because "his options were to proceed to trial with conflicted counsel he could not meaningfully talk with, or to represent himself."  *Id.*  To show an involuntary waiver, however, a defendant must first demonstrate good cause warranting the substitution of counsel.  *See, e.g.*, *Taylor*, 113 F.3d at 1140; *Padilla*, 819 F.2d at 955.

Williamson has failed to do so here, presenting no meritorious arguments that Mr. Fowler's representation was inadequate or that a new attorney was required.  The district court had previously supplied Williamson with new counsel.  Then, the court held multiple hearings to address Williamson's requests for yet another new attorney and denied all of his motions.  And, as we have previously explained, none of Williamson's complaints about Mr. Fowler merit a

different outcome on appeal. Williamson therefore voluntarily waived his right to counsel.[8]

Under the second part of the inquiry, Williamson argues he did not knowingly and intelligently waive his right to counsel. *See* Aplt. Br. at 40. The record does not support his claim. In fact, the district court conducted a thorough *Faretta* inquiry, ensuring that Williamson understood that representing himself would require him to conduct every phase of the trial. The court confirmed that Williamson had read the indictment and understood the charges against him and the possible penalties he faced. The court warned Williamson that if he represented himself, the judge would not be able to advise him on how to try his case, he would be responsible for determining the defenses he could raise at trial, and the procedural rules of the courtroom would not be relaxed for his benefit. The district court even strongly cautioned Williamson against proceeding pro se, describing it as "a grave and severe mistake." R., Vol. 1 at 469–71. Finally, prior to opening statements, the trial judge reiterated many of the court's warnings and conducted a colloquy with Williamson to ensure that he remembered his previous conversation with the court, had thought about it, and that his opinion had not changed.

---

[8] Williamson also argues that his waiver of counsel was involuntary because the district court first suggested that he proceed pro se. *See* Aplt. Br. at 40. But that argument fails. We encountered a similar situation in *Taylor*, 183 F.3d at 1203, yet still concluded that the defendant's decision to represent himself was voluntary. *See id.*

We therefore reject Williamson's waiver argument.[9]

## C.  *Suppression of Evidence*

Williamson's final argument is that the district court erred in denying a motion to suppress evidence recovered from a search of his residence. Williamson contends the search warrant was facially deficient, because it failed to express a finding of probable cause and state that it was a "search warrant" on the face of the document.

The magistrate judge reviewing the motion to suppress found the following facts: Lawrence, Kansas police detectives Scott Slifer and Mike Schneider met with a local Indiana judge to obtain a search warrant for Williamson's home. Detective Slifer presented two documents to the judge: (1) a five-page, single-spaced affidavit in support of the search warrant; and (2) an untitled, one-page document in the format of a search warrant.  The first five paragraphs of the documents were identical, and both specifically identified the address of the place to be searched and the items to be seized.  Both documents also concluded with a signature line for the affiant, followed by the words, "[s]igned and sworn to before me on June 04, 2012, by Scott Slifer," and a signature line for the judge. R., Vol. 1 at 126.  The judge swore Detective Slifer to the probable cause

---

[9] Williamson claims that another *Faretta* hearing should have been conducted prior to his sentencing, but we rejected that argument in *United States v. Vann*, 776 F.3d 746 (10th Cir. 2015), describing such a rule as "unworkable." *Id.* at 764.

affidavit and approved and signed both the warrant and the affidavit. Detectives

Slifer and Schneider, along with Indiana police officers and detectives, executed

the search warrant later that morning and seized numerous items from

Williamson's Indiana residence, including computers and related equipment, a

cell phone, and a digital camera. But "due to an oversight," the magistrate judge

found that "[D]etective Slifer signed the warrant [but] did not sign the probable

cause affidavit." R., Vol. 1 at 126–27.

After making these factual findings, the magistrate judge recommended that

Williamson's motion to suppress be denied, and the district court—after

reviewing the magistrate judge's Report and Recommendation—adopted the

recommendation in its entirety.

The Fourth Amendment requires two elements for a search warrant: (1)

probable cause supported by an oath or affirmation; and (2) a particular

description of the place, persons, and things to be searched and seized. U.S.

Const. amend. IV; *see also United States v. Brakeman*, 475 F.3d 1206, 1211 (10th

Cir. 2007). We do not apply a "hypertechnical approach to search warrants."

*United States v. Massey*, 687 F.2d 1348, 1356 (10th Cir. 1982). Instead, we have

"adopted a standard of 'practical accuracy rather than technical precision.'"

*United States v. Ortega-Jimenez*, 232 F.3d 1325, 1328 (10th Cir. 2000) (quoting

*United States v. Simpson*, 152 F.3d 1241, 1248 (10th Cir. 1998)). Indeed, the

Fourth Amendment does not require that a written affidavit establish probable

cause; "it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (quoting U.S. Const. amend. IV); *see also United States v. Shields*, 978 F.2d 943, 946 (6th Cir. 1992) ("The Fourth Amendment does not require that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record or made part of the affidavit."); *Frazier v. Roberts*, 441 F.2d 1224, 1226–27 (8th Cir. 1971) ("It is clear that the Fourth Amendment permits the warrant-issuing magistrate to consider sworn oral testimony supplementing a duly executed affidavit to determine whether there is probable cause upon which to issue a search warrant.").

Additionally, "nothing in the [text of] the Fourth Amendment [expressly] conditions the validity of a warrant on its being signed." *United States v. Cruz*, 774 F.3d 1278, 1285 (10th Cir. 2014) (quoting *United States v. Lyons*, 740 F.3d 702, 724 (1st Cir. 2014)). In both *Cruz* and *Lyons*, the judge reviewed the police officers' probable cause application, determined that probable cause existed, and signed the application and accompanying affidavit, but inadvertently failed to sign the warrant itself before the officers conducted the search. *See Cruz*, 774 F.3d at 1285–86. The defendant in *Cruz* argued that the warrant was thus "facially deficient at the time of the search because it lacked any indication that a neutral and detached magistrate had made a determination of probable cause." *Id.* at 1286–87. We rejected this argument, stating, "Cruz erroneously interprets this

first requirement as requiring the face of the warrant itself to 'contain[] . . . markings,' preferably a signature, 'indicating a neutral and detached magistrate . . . actually' made a finding of probable cause. Nothing in *Groh*, however, let alone the text of the Fourth Amendment itself, imposes such a facial requirement." *Id.* at 1287 (referencing the Supreme Court's decision in *Groh v. Ramirez*, 540 U.S. 551 (2004)).

Here, Detective Slifer's inadvertent failure to sign the affidavit does not violate the probable cause requirement. The magistrate judge found that three facts demonstrated a sufficient "oath or affirmation" of probable cause, even absent Detective Slifer's signature on the face of the affidavit. First, detectives Slifer and Schneider both testified that the Indiana judge swore Detective Schneider to the "truth and veracity" of the affidavit he presented in support of the search warrant. Second, the judge signed both the affidavit and the search warrant; and third, Detective Slifer signed the search warrant under the sentence that read, "Affiant states the following facts which he has reasonable grounds to believe and does believe to be true." R., Vol. 1 at 142–43 (quoting the search warrant).

Williamson also argues that the search warrant was invalid because it did not include the title "search warrant." To require that a search warrant contain the title "search warrant" would fall under the requirements that we have rejected as "hypertechnical." *Massey*, 687 F.2d at 1356. The text of the warrant itself is

sufficient to "assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh*, 540 U.S. at 561 (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).

Accordingly, we find no error in the district court's denial of Williamson's motion to suppress.

## III.  Conclusion

We AFFIRM the district court's decision in its entirety.